UNITED STATES DISTRICT COURT
District of Minnesota
Criminal No. 15-49(4) (MJD/FLN)

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | GOVERNMENT'S POSITION ON SENTENCING |
| ABDIRAHMAN YASIN DAUD, | |
| Defendant. | |

The United States of America, through its attorneys, Andrew M. Luger, United States Attorney for the District of Minnesota, and Assistant United States Attorneys John Docherty, Andrew R. Winter, and Julie E. Allyn, respectfully submits its Sentencing Position in this case. After consideration of all the facts of this case, as well as the United States Sentencing Guidelines (hereinafter the "U.S.S.G."), and the factors set forth at Title 18, United States Code, Section 3553(a), the United States believes that a sentence of thirty years' imprisonment, followed by a lifetime of supervised release, is sufficient, but not greater than necessary, to achieve justice in the sentencing of this defendant.

## I.    INTRODUCTION

Following a three-defendant jury trial of over three weeks, Defendant Abdirahman Yusin Daud ("Defendant") was convicted of Conspiracy to Murder Outside the United States in violation of 18 U.S.C. §§ 956(a) and 2; Conspiracy to Provide Material Support to a Designated Foreign Terrorist Organization, in violation of 18 U.S.C. § 2339B(a)(1); and, Attempting to Provide Material Support to a Designated Foreign Terrorist

Organization in violation of 18 U.S.C. §§ 2339B(a)(1). Defendant was acquitted of a Perjury charge.

The evidence at trial showed a large, long-term conspiracy that contained within it three distinct efforts by the conspirators to reach Syria, where they would join, and fight for, ISIL – one attempt in the Spring of 2014 which resulted in two travelers reaching Syria, while a third traveler was denied boarding at the airport by law enforcement; and other men were stopped by family; a second attempt, in the Fall of 2014, in which five travelers tried to reach Syria, but all were denied boarding at either Minneapolis – Saint Paul International Airport or John F. Kennedy International Airport in New York City; and a third and final attempt, in the Spring of 2015, in which two conspirators tried to reach Syria via Mexico after driving to San Diego, California, to buy fake passports, then planned to use those fake passports to cross into Mexico, from where they would make their way to Syria. This third attempt was unsuccessful, and resulted in the arrest of six of this case's defendants.

A detailed recitation of the facts of the case can be found in Common Appendix A, which is attached to this Sentencing Position, and in the Report of Presentence Investigation ("PSR") prepared by the United States Probation Office. The evidence at trial showed Defendant was a full and willing participant in all three efforts made by the conspirators to reach Syria and join ISIL.

Several men from Minnesota have died in Syria as a result of the conspiracy of which Defendant was a part. Other men from Minnesota have reached Syria, and are active members of ISIL, a dangerous international terrorist organization which threatens the national security of the United States. Defendant lied to the grand jury, and, in his self-

2

serving statements to the probation office in advance of sentencing, he has continued to lie about his conduct and his motivations. To protect the public from the danger which Defendant poses, to provide just punishment, and to deter others from joining foreign terrorist organizations, the thirty-year sentence recommended by the government is appropriate.

## II.    THE FACTS OF THE CASE AGAINST DEFENDANT DAUD

As noted, the evidence at trial showed that Defendant was a committed, dedicated and enthusiastic member of this conspiracy, who was highly motivated to go to Syria, join ISIL, and perpetrate violence on that terrorist organization's behalf. As discussed in more detail later, Defendant's desire and dedication to becoming a terrorist for ISIL was most overtly exposed upon his apprehension in San Diego in April 2015 when he was attempting to obtain a fake passport. But long before Defendant's arrest, Defendant hid in the shadows of the conspiracy – encouraging others to become fighters for ISIL and biding his time until he himself could leave to fight jihad[1] in Syria. From the very beginning, Defendant was intimately involved with the group planning to fight for ISIL – participating in weekly meetings to discuss the situation in Syria, and ultimately, deciding that ISIL was his, and his co-defendant's, chosen terrorist group. When the FBI began to focus on Defendant and his friends' attempts to leave for Syria, Defendant first lied and obstructed the

---

[1] The word "jihad" is fraught with the possibility of misunderstanding. As used in this memorandum, "jihad" means perpetrating acts of violence against non-Muslims, a category that includes many people who are Muslim, but are considered by ISIL to be either insufficiently zealous (most Sunnis), or else to hold beliefs that ISIL does not recognize as Muslim at all (the Shi'a).

3

investigation, and later attempted himself to travel to Syria mere months after he testified before the Grand Jury.

The evidence against Defendant includes the testimony of cooperating witnesses at trial and of conversations which Defendant himself participated in when he thought his words were not being recorded.

### A. Defendant Daud's Participation in the Conspiracy During the Spring of 2014

Over a year before Defendant's arrest, by March 2014, Defendant was part of a group of friends that included co-defendants Mohamed Farah, Guled Omar and Abdirizak Warsame, actively discussing the events in Syria when, another man known to the group, Hanad Mohallim ("Mohallim"), left Minnesota for Syria to fight for ISIL. (Transcript of testimony of Abdirizak Warsame, May 24, 2016, at page 7 (hereinafter "Warsame, 5/24/16, Tr. p.")). Mohallim's departure surprised the conspirators because he was younger and appeared to effortlessly leave the United States for Syria. Inspired, Daud and other coconspirators met to discuss the ramifications of Mohallim's departure. (PSR ¶ 22; Warsame 5/24/16, Tr. p.14).

After Mohallim's departure, the group met frequently and focused their attention on ISIL; watching propaganda videos on-line to learn more about ISIL and jihad. (PSR ¶ 23; Warsame, 5/24/16 Tr. p. 14-17; Transcript of testimony of Abdullahi Yusuf, 5/13/16, at page 74 (hereinafter "Yusuf, 5/13/16, Tr. p.")). The videos watched by the defendants included the teachings of Anwar al-Awlaki. Anwar al-Awlaki was an American-born Sunni cleric who gained notoriety by living in Yemen and becoming a senior figure within

4

*al-Qaeda.*  (Transcript of testimony of Charles Lister, 5/12/16, at page 129 (hereinafter "Lister, 5/12/16, Tr. p.")).  Anwar al-Awlaki narrated numerous videos, such as "*Advice to Those Who Stay Behind from Jihad*"[2], that have served as recruitment tools to motivate people to become jihadists.  Lister described in his testimony the type of advice given by Anwar al-Awlaki in this particular video:

> *Well, essentially the advice is don't stay behind.  His advice is, you know, don't allow your family ties to distract you from the necessity of you going to fight Jihad, don't allow your wealth and your comfortable surroundings in the west to distract you from the necessity of going to fight Jihad.  So his message is basically, yes, you can do some good things at home if you live in the west, yes, you have a comfortable life, yes, you have many good family members, but the overarching importance in your life as a Muslim is to go and fight Jihad, and that must come above everything else.*

(Lister, 5/12/16, Tr. p.129).

  Defendant's admiration for Anwar al-Awlaki and his teachings was profound, and Daud did not keep his admiration of al-Awlaki and his teachings to himself.  When Abdullahi Yusuf, the youngest co-defendant, was new to the group, Daud encouraged Yusuf to watch and learn from the videos of al-Awlaki.  (Yusuf, 5/13/16, Tr. p. 73-74; PSR ¶ 22).  Daud also could be heard on an undercover recording[3] exalting the superiority of al-Awlaki's teachings to Mohamed Farah and Bashir:[4]

> AD:     *--and I started watching, uh, videos from, like, Anwar wallah, Anwar's dawah was amazing, bro.*

---

[2] Trial Exhibit 259.

[3] From February 12 until April 19, 2015, coconspirator Abdurahman Bashir, who by that time was a cooperating individual with the FBI, recorded dozens of hours of conversation with Defendant Daud and his co-conspirators.

[4] The speakers in the undercover recordings are identified by their initials.  "CHS" refers to Bashir.

MF:   *He's [UI].*

AD:   *[OV] He started off so {the other one}.  He taught you about the prophets.  [laughs] Once you learn about the prophets?  He talks to you about the Sahaba.  And once you learn about the whole—{you learned} the Medin [PH] Period, the Meccan Period, and then he goes into the concepts of the path of jihad.  Hijra advice. Those who stay behind. {Your whole self} you are ready.  You're good to go.*

CHS:  *[OV] I remember—*

AD:   *[OV] If you start from the beginning to the end, wallah, you're good to go.*

(Trial Exh. 232 (audio), 233 (transcript p. 301)).

Inspired and motivated in the Spring of 2014 by Mohallim's departure, with Guled Omar ("Omar") as their emir, the group pushed forward with specific plots to leave for Syria in the Spring of 2014.  (PSR ¶ 24).  In order to succeed, the group recognized they would need to obtain travel documents and money.  Although Omar was emir, Daud was no mere passive follower of Omar's plans.  Rather, the two were often in conflict with each other (PSR ¶ 103).  This was evident in a conversation Omar had with Bashir wherein Omar related what Daud said to him when Daud learned Omar was the emir:

> *"Okay I'll [Daud] call you my Amir, but does that mean that you [Omar] can tell me if I stay or go?"  I was like, "Yeah.  If I tell you to stay behind you will stay behind."  [Daud]'s like, "I don't know about all that."*

(Trial Exh.197 (audio), 198 (transcript p. 32)).

Ultimately the group of men who tried to go to Syria to join ISIL at the end of May and early June 2014 did not include Daud.  But his absence was not due to a lack of desire to leave.  Rather, Daud was thwarted by his lack of travel documents.

6

Daud's failure to obtain travel documents at this time was not for lack of trying. At the exact time-frame (April 2014), that his other codefendants were attempting to obtain their expedited passports, Daud similarly applied for an expedited refugee travel document. (PSR ¶ 26). This application languished in the approval process and so at the time the other were making concrete plans to leave in May, Daud did not have a valid travel document (his application was pending until it was officially denied November 4, 2014). (PSR ¶ 26; *See* Trial Exh. 14.) Accordingly, although Daud strongly desired to leave the United States for Syria in the Spring of 2014, his desire was frustrated at the time because he lacked a travel document. He did not stay behind based on a moral objection, a lack of devotion to the cause of joining ISIL, or other doubt or fear; he just simply did not have the ability to leave.

The precise plot Daud wanted to join included leaving with Bashir, Yusuf Jama and Omar, by car to California, and then slipping into Mexico. (PSR ¶ 37). Daud's strong desire to leave as part of this scheme was revealed in Omar's explanation to Bashir about Daud:

> *Cause you know what he [Daud] wanted to do? He didn't have no, he didn't have no travel document at that time. He didn't have no passport and he was trying to go with me and you and Yusuf [Jama]. You remember me, you and Yusuf? How we were going to Cali? And we're gonna, me and Yusuf were planning to go to Mexico and trying to find –travel documents from there and if we don't find –travel documents, we were going to use our own passports. That was our second backup. Our second backup was our own passports. But this guy wanted to come with us without a Plan B. He said, "I wanna just go though." I was like, "Dude, if we just go to Mexico and me and Yusuf can't find nothing. We gonna take our passports and use it and leave. What are we gonna do with you? We gonna leave you in Mexico?" "No, ya'll gonna give me two weeks, stay with me for two weeks to find it" - he said. I was like, "Hell no, I'm not going to a foreign country that I don't*

*know their language that I don't know nothing and then being stuck there
with you."  I was like, "I'd rather have you just stay here and be patient and
wait for your –travel documents.- Get your stuff, and then -leave.-. He's like
"No, I'm tryin' to come with ya'll."  But we were like, "No!"  Yusuf even try
to tell me, "Guled just let him come."  But then I was like, "Yusuf, you have
to understand that if me and you go there and we go to Mexico and we can't
find shit, and he gets stuck over there, we're not going to leave him. We're
going to be stuck there with him. And we gonna all fall in that hole together."
He's like, "Oh."  And then Yusuf's like, "ok."  And then we were like, "Ok,
Daud's not going to come."  That's why we came to you and told you to come
drive with us, because he was supposed to drive with us instead you know?
He was supposed to be our third driver.  (UNI) After that, he was like,
"You're not my Amir anymore. You're soft. You're scared of the kuffar."*

(Trial Exh. 197 (audio), 198 (transcript p. 32)).[5]

Even without a travel document, Daud was well involved in planning and
encouraging the other coconspirators during this time.  For example, Daud strategized
about what mode of communication they could use to avoid government detection.  Daud
specifically suggested to Abdullahi Yusuf ("Yusuf") that he use "Surespot" as an encrypted
instant messaging application *"that the Feds didn't know about it"*, and Daud also used
the Kik application because he did not believe it was "hot."[6]  (Yusuf, 5/13/16, Tr. p. 85-

---

[5] Words from Daud's own mouth demonstrates his detailed knowledge of the plot to drive
to Mexico via California.  That is, during a recording in April, when Daud was discussing
a car rental with Bashir, he referred back to the car Yusuf Jama rented for the Spring 2014
plan: *"But we want a nice little, uh, Toyota Corolla bro. … That Toyota Corolla Yusuf had
-- …the one Yusuf had was nice…".*  (Trial Exh. 245 (audio), 246 (transcript p. 29)).

[6] Daud's appreciation of Kik was best revealed during an undercover recording in April
2015.  While Omar, Bashir, and Mohamed Farah were discussing communicating with
ISIL fighters such as Roble, Nur and Abdifatah, they bring up "Kik" which is a cell phone
application that allows for communication.  Daud defended the merits of Kik, explaining
to the group that Kik was a Canadian based company and thus the US government could
not do *"extra computer techy stuff"* to retrieve the conversations.  Daud bragged that Kik
was *"not hot bro"* otherwise *"they would have locked us up years ago, my friend..."*  (Trial
Exh. 193 (audio) 194 (transcript p. 10); PSR ¶ 111).

86; Warsame, 5/25/16, Tr. p. 30; PSR ¶ 24). Daud also told and encouraged coconspirators, such as Nur, to shop for supplies for their trip to Syria. (PSR ¶ 141; Warsame, 5/25/16, Tr. p. 124).

More importantly, in preparation for Yusuf's departure, Daud gave Yusuf some crucial phone numbers to ensure his passage into Syria. Specifically, of the various plots in the Spring of 2014, Yusuf's plan to leave was to fly from the Minneapolis airport and arrive in Turkey. Once in Turkey, Yusuf would still need to make his way into Syria to join ISIL. To ensure that success, Daud gave Yusuf two phone numbers for Yusuf to call once he arrived in Istanbul.[7] (PSR ¶ 31; Yusuf, 5/13/16 Tr. p.153-154). These numbers were for ISIL operatives who would help get Yusuf from Turkey and into Syria to fight for ISIL. (PSR ¶ 31; Yusuf, 5/13/16, Tr. p.153-154). Daud once again shared his knowledge with Yusuf to ensure Yusuf's successful transformation to a ISIL fighter.

Ultimately, co-defendants Omar and Abdullahi Yusuf did not make it to Syria. But with the help and encouragement of Daud and other coconspirtors, Nur and Yusuf Jama successfully slipped out of the United States at the end of May/early June and made their way to Syria where they became ISIL fighters. (PSR ¶ 33; 38). They are now presumed dead. (PSR 40).

With Nur and Jama's successful travel came FBI scrutiny. The group, therefore needed to hide their radicalization and lay low until they were ready to try again for Syria.

---

[7] When Daud's defense attorney tried to attack Yusuf's assertion that Daud gave him these phone numbers, Yusuf firmly replied: *"I mean, sir, you can cut it which way you want to, but Abdirahman Daud gave me those two phone numbers."* (Yusuf, 5/16/16, Tr. p. 151).

### B. Defendant Daud's Participation with Coconspirators Summer 2014

From time to time in this conspiracy, there would be periods wherein the defendants' radicalization and attempts to travel were less overt, typically following the failed attempt by one of the members to travel. The summer of 2014 appears to be one of these time periods in which the conspirators engaged in a tactical pause. Such a pause did not mean Defendant and this group were any less dedicated. Rather, concealing their motives was part of the strategy of the conspiracy, or, as put by Defendant: "*fake it until you make it*." (PSR ¶¶ 43, 115; Trial Exh. 232 (audio) 233 (transcript, p. 216)). Later in the conspiracy, Daud specifically explained this idea: that to execute their *jihadist* plans, they needed to trick the Government into believing they were normal American kids: "*The-the way to-to fake the government (you know?) You get a job (normal) be American citizen. Wallahi, (they'll get off your back.) Go to school full time. That's the type of stuff.*" (Trial Exh. 232 (audio), 233 (transcript p. 283)).

It appears that during the summer of 2014 members of the conspiracy maintained contact via social media with ISIL fighters operating inside Syria and Iraq. As ISIL expanded its territory in Syria and Iraq through successful attacks and military campaigns in the summer of 2014, the terrorist organization's propaganda flooded the internet. The evidence showed that the coconspirators consumed, discussed, and promoted these violent videos with each other. Anwar al-Awlaki's preachings were often embedded within ISIL videos. (*See* Trial Exh. 259).

Exemplifying the importance of these propaganda videos, co-defendant Abdurahman can be heard during one of the undercover recordings explaining the

10

significant number of ISIL videos coming out during the summer of 2014, noting: *"[t]he Wilayaat[8] they make their own (UNI).  So it's just daily, bro.  It's like news.  It's not even, uh, inspiration anymore.  It's just news.*"  (Trial Exh. 203 (audio), 204 (transcript p.88)).  Defendant Daud similarly consumed and discussed these ISIL videos.  For example, in one recording Daud is heard discussing with Bashir and co-defendant Mohamed Farah an ISIL video that depicts children fighting for ISIL.   During that recording, Bashir asks *"You know, you see the videos where the little kids are at?"* To which Daud responds: *"Oh, wallah, wallah, that's beautiful, bro."*  And then later Daud adds: "*they go with dads, too.* To which Mohamed Farah explains: *"The dads are beheading people. What do you think the kids?  He wants to do what his dad's doing."* Bashir asks: *"One of the sahabahs, like, he used to take his son, give him a little knife and, uh, execute the wounded kuffar.  You ever hear that one?"*  Although Mohamed Farah responds *"no,"* Daud affirms: *"Yeah.  I-I love that."*  (Trial Exh. 232 (audio), 233 (transcript p. 192-33)).[9]

In the Summer of 2014, Defendant Daud with many of the coconspirators attended multiple paintball sessions as training for combat with ISIL.  (PSR ¶ 44).  The undercover recordings revealed the significance of these paintball sessions.  For example, during the March 15, 2016 recording, co-defendant Abdurahman can be heard reflecting back on participating in paintball during the summer of 2014, and reiterating that "*paintball was amazing*" to which co-defendant Omar confirmed, "*[w]e was literally treating it like it was*

---

[8] *Wilayaat* refers to ISIL provinces or administrative regions.
[9] The coconspirators appear to be discussing the "ISIL Training Children" video. Although this specific video was not an exhibit at trial, it was disclosed to defense attorneys.

*real war, bro."* (PSR ¶ 44). Similarly, Yusuf testified that they shouted "Allahu Akbar"[10] during the paintball game. (PSR ¶ 44; Yusuf 5/13/16, Tr. p. 188-189).

By late Summer and into early Fall, Defendant and several of his co-conspirators found work through a temporary employment agency that would allow them to earn money to pay for their next attempt to travel overseas to join ISIL. Specifically, Defendant Daud, as well as Adnan Farah, Mohamed Farah, Bashir, Abdurahman, Omar, and Musse all began work at a commercial shipping and mail facility. (PSR ¶ 43). In one recording, co-defendant Omar reminisced with co-defendant Abdurahman, stating *"[w]hen we were working at [ ] everything was going perfect…We were working, the kuffar were not, they didn't even know we worked together, they didn't even know nothing, bro.*" (PSR ¶ 43; Trial Exh. 203 (audio) and 204 (transcript p. 123)). Bashir described how he and members of the conspiracy discussed plans to travel to Syria while processing mail, while on break, and when they went outside the mail facility to pray. (Bashir, 5/19/14, Tr. p. 62-63). Some, like Mohamed Farah, watched ISIL videos while getting paid by the temporary agency. (PSR ¶ 82).

During one recording with Bashir and Mohamed Farah, Daud specifically recollected about how little he actually worked and bragged that the job afforded him the opportunity to hang out with the co-defendants and, presumably, watch ISIL propaganda videos on his iPad:

> *"I used to do whatever I want." "I used to have my iPod." … "we didn't fully work" … "We were – were together – … – hours, bro, a day."*

---

[10] This phrase means "Allah is greater" or "god is great".

(Trial Exh. 232 (audio), Ex. 233 (transcript p. 204, 208, 209)).[11]

During this same timeframe, Defendant Daud, Abdurahman, Adnan Farah, Mohamed Farah, Musse, and Omar all attended "Tawheed meetings" together. During these meetings, the conspirators discussed the "oneness" of Islam, events in Syria, ISIL's latest propaganda videos, as well as novel methods of travel into Syria to join ISIL. (Bashir, 5/19/16, Tr. p. 67-69.) Also in October of 2014, Defendant appeared in Exhibit 182, a "Flipagram" video produced by co-defendants Adnan and Mohamed Farah's younger brother. This video (essentially a slideshow) depicts many of the co-conspirators along with pro-ISIL and pro-Jihadi imagery. All this time was an opportunity to build to their next attempt to join ISIL – a plot that became real in the Fall of 2014.

### C. Defendant's Participation in the Fall 2014 Plot for Coconspirators to Travel to New York to Join ISIL

By the Fall of 2014, Daud and his co-defendants were ready to attempt travel to Syria again. The group considered many different methods to accomplish their goal to travel to Syria undetected (e.g., leaving with family in December 2014) (PSR ¶ 47, 48); however, once again lack of money and travel documents remained obstacles.

For money, the coconspirators brainstormed several ideas, including committing financial aid fraud to obtain thousands from the Government to fund their travel. Bashir recounted how in October or November of 2014 when Defendant Daud was present, along with several other members of the conspiracy, Mohamed Roble ("Roble") discussed his

---

[11] It was also during this exchange that co-defendant Mohamed Farah explained to Daud that one of their coworkers walked in on him while he was watching the ISIL video "Flames of War."

own plan for travel to Syria to join ISIL.  Knowing that Roble had a large amount of money, the group pressed Roble to provide funds to them for their own travels.  (Bashir, 5/19/16, Tr. p. 20-21).  Evidence in the case has demonstrated that Roble did get to Syria where he has since joined ISIL.  The undercover recordings further confirm that Roble was, for a period of time, co-located with Bashir's uncle, Abdi Nur, and that Roble maintained contact with his co-conspirators in Minnesota.

When the group learned in October 2014 that Abdullahi Yusuf may be arrested before they could execute their next plot to leave, Daud emerged as a leader and organizer. Daud pushed the group to advance their planned-for departure to November, rather than wait for the previously-discussed December departure date.  (PSR ¶¶ 52; 90-92).  The fall 2014 plot that materialized in November ultimately involved four travelers – Mohamed Farah, Musse, Abdurahman, and Ahmed – flying from New York City ("JFK 4"), and one additional traveler – Omar – flying to California.

Bashir's recordings capture the codefendants discussing the failed travel of these five erstwhile travelers.  In these recordings, the conspirators hold Daud responsible for hastily pushing the group to leave in November.  For example, in Omar's long explanation to Bashir on March 3, 2015, summarizing the previous plots to leave, Omar explicitly detailed how Daud came up with plans to get a group out of the United States in early November.  Omar told Bashir:

*"So, we got everything planned out. And then Daud comes up comes and he, he makes his own plan." ... "I don't know how, Daud outsmarted all of them.  But he told them, 'We're going to keep the date of November 8th and we're gonna take.'  He's like,*

14

*"I'm a still take Abdishakur, Caas, them's passport and we will go through Mexico."*[12]
(Trial Exh. 197 (audio), 198 (transcript p. 26)). Omar explained he confronted Daud and
begged Daud to let a group of them leave later with *"legit plans"* but Daud responded:
*"No! We are leaving on the 8th."* (*Id.*). Omar continued explaining that Daud *"hyped us
up to the point like we're about to leave:"*

> *Hanad got hyped up. And Zach got hyped up Daud. That's what I found
> out. I'm like, 'What?' I'm like, 'Are you that stupid? This niggga is not
> doing nothing himself. He's not trying to make moves himself. He's telling,
> he's telling you guys, 'Go, go, go, go, go.' Rushing and hyping ya'll up."*
> ...
> *"But at the end of the day bro, Daud he like he was there throughout the
> whole thing. Until today, he didn't get in one trouble. He didn't make one
> move. He didn't do nothing. He just, just doing his thing. If it wasn't for
> him that came up with the November 8th hype, Zach would not be in the
> position he is today. I would not be in the position I'm in today. Hanad
> would not be in the position he's in today. All because of that rush that he
> did to them.*

(Trial Exh. 197 (audio), 198 (transcript p. 28 -29)).

Further proof of Daud's role as the prime mover behind the November attempt is
found scattered throughout other recordings as well. For example, on February 17, Hanad
Musse stated *"someone was hurrying us up bro . . ."* (Trial Exh. 189 (audio) and 190
(transcript, p. 17)). Then later on February 27, when Bashir asked about Daud,
Abdurahman responded: *"That boy made us hasty bro. Wallahi billahi, he's the one that*

---

[12] In the Fall of 2014, Daud did still did not have valid travel documents, but that did not
deter him as evidently he hatched a plan to steal passports as noted above and by Omar's
further statement: *"they're making a plan to break into Caas's house and steal his
passport, ya know?"* (PSR ¶ 49; (Trial Exh. 197 (audio), 198 (transcript p. 26)). This
statement demonstrates the extreme to which Daud was willing to go (committing
burglary) in order to achieve the goals of the conspiracy.

*cults us up bro. ... Wallah billah. You remember all those meetings? How we're goin' do*

*on this days, ha, ha, and then they didn't do it, and then we already had everything together*

*so, you know, we don't wanna wait for anyone. Like if I just waited, December, and just*

*went to Umrah. ...Smooth, right?... And then Hanad [Musse] could have went all by himself*

*his dad said, 'help me.' Crazy, right?*"

(Trial Exh.195 (audio), 196 (transcript, p. 3); PSR ¶ 103).

Daud's contributions and influence over the November 8 travelers extended far beyond merely scheduling the date of travel. Daud was also willing to supply money to assist his coconspirators. For example, when Bashir learned of the Fall 2014 plot through ISIL fighters Mohallim and Nur, he immediately confronted Defendant Abdurahman. (Bashir, 5/19, Tr. p. 101). Abdurahman met Bashir at the Dar al-Farooq Como mosque and confirmed for Bashir, "*yeah, we [are] planning*" and that "*we are leaving right now, really soon, in about a week or two.*" (Bashir, 5/19/16, Tr. p 101). Bashir, who wanted to join in on the travel, but was at the time short on cash for traveling overseas, also asked Abdurahman for money. Defendant Abdurahman told Bashir that he did not have funds for him but encouraged Bashir to "*go to Daud and talk to him.*" *Id.*

Bashir then drove to Karmel mosque where he found Daud and co-defendant Adnan Farah and confronted them about leaving without him. (Bashir, 5/19/16, Tr. p. 102.). Daud confirmed that they were "leaving really soon" and further explained he was looking at flights for November 8th. (Bashir, 5/19/16, Tr. p.103). When Bashir asked Defendant for money to join their travel, Daud responded: "yeah, I'll give you $150 for a passport."

16

(Bashir, 5/19/16, Tr. p. 104; PSR ¶ 51). Later, in the undercover recordings, Daud confirms

that he was prepared to give Bashir money with which to travel to Syria:

> CHS: *"Yeah. What happened to that money that you all are supposed to give me to get my passport, nigger?"*
>
> AD:   *"I did have it, wallah.*
>
> CHS: *[laughs] You never gave it to me.*
>
> AD:   *I gave it to Mohamed.  [laughs]*

(Trial Exh. 214 (audio), 215 (transcript, p.93).

Significantly, as discussed in more detail later, Daud, advised the group that he had

contact with an ISIL fighter named "Antar" who could facilitate the group's entry into

Syria to fight for ISIL.  (PSR ¶ 50; Yusuf 5/16/16, p. 25).  Had the JFK 4 made it to Turkey,

this contact would have been their key to unlock their entrance into Syria.

Ultimately the coconspirators failed in their November travel attempt when the FBI

stopped all the men at the airport.  Despite the failed effort, and the ensuing intervention

by the FBI, Defendant Daud did not abandon his hopes to leave for Syria.  Rather, after the

failed November attempt, Bashir testified that the group - including Daud – discussed how

they were sent back from NYC, what they should have done (e.g. split up the foursome

with two leaving from Milwaukee and two from Boston), and what to do going forward, to

include – at co-defendant Abdurahman's suggestion – reducing their visible footprint on

the internet.  Bashir testified that Defendant Abdurahman told the group, "*[w]e need to get

off social media, stop having those profiles that support ISIS and talking about jihad*."

(Bashir, 5/19/16, Tr. p. 114).  Bashir then testified:

A.    *I was agreeing with him about how we need to stay off of social media.*

Q.    *What response did you get from any of the others from that?*

A.    *I got a response from Daud, and he laughed at us, and he was saying,*
      *"You guys are scared of kuffar.  I'm not scared."*

(*Id.*).

### D. Defendant Daud Obstructed the Investigation in January 2015

After the conspirators' failed attempt to leave the United States in November, Daud was subpoenaed to testify before a Federal Grand Jury.  Although the FBI's attention was certainly drawn to the individuals who attempted to depart the United States, the scope of the investigation was broader.  Daud, then, had an opportunity to assist in this investigation and repudiate his desire to fight for ISIL when he came to testify before the Grand Jury on January 22, 2015.  Daud, however, made a mockery of the Grand Jury process with lies, insolence, and game-playing.

Daud's lies ranged from simple answers like claiming he did not know Hanad Musse's last name, to more crucial deceits about the JFK 4.  Daud clearly knew the motives and details of the travel plans of the JFK 4, but when asked about their travel he repeatedly lied.

Prosecutor:  *"Did Mohamed Farah ever talk with you about traveling to*
             *Syria?"*

Daud:        *"No."*

Prosecutor:  *"And you laugh. Why is that?"*

Daud:        *Because that's – because the guy's here.*

Prosecutor:  *I know he's here but –*

18

> Daud:        Yeah.
>
> Prosecutor:  But my question, Mr. Abdirahman Daud, was did he ever talk
>              to you about traveling to Syria?
>
> Daud:        No.  No.

(Defendant's 1/22/15, Grand Jury Testimony Transcript, Trial Exh. 340, ("Trial Exh. 340"), p. 23-24).

Daud thereafter double-downed on his lie and insisted that when Mohamed Farah went to New York City in November 2014, Mohamed Farah was trying to go on "vacation." Daud continued with slippery and evasive answers about his co-conspirators' attempted travel, claiming he did not know if Mohamed Farah and Musse were traveling together. (Trial Exh. 340, p. 30). Thereafter, Daud made a play for sympathy to the Grand Jurors, lamenting that *"now nobody wants to go on vacation no more, to be honest, nobody does,"* (*Id.* p. 34) and *"we're all on the same side, man. We're not different. I'm an American. I pay taxes. I pay I don't know how many cents it is, but I do my part, man, so I'm just like you, so…"* (*Id.* p. 48). Daud, evidently, was trying to fake it until he made it even while under oath before a Federal Grand Jury.

### E.  Daud Was in Consistent Communication with ISIL Fighters

Although Daud's associates Mohamed Roble and Abdi Nur were fighting for ISIL in Syria, this distance did not deter Daud from communicating with his fellow terrorists. For example, Daud described to Bashir a conversation he had with Roble about Roble's religious teachings in Syria and how he was jealous of Roble. (*See* Trial Exh. 232 (audio), 233 (transcript, pg. 278)).

Defendant similarly had significant contact with Nur, by then a dedicated ISIL fighter who would proudly post pictures of himself holding an AK-47. For example, Daud communicated with Nur about the group getting money from him for their plotting:

> AD:    *[OV] Abdi told me {other thing}, they ballin' with money bro. They said, bro, money he said. Wallahi, he said, "We have enough for you, for anybody." So if we get stuck anywhere, we just got to get some freaking... ahh... buy our tickets.*

(Trial Exh. 210 (audio), 211 (transcript, p. 89)). And Daud made sure to let Nur know they were executing their plan and should soon be in Syria:

> AD:    *... Curry bro, he's so hyped bro. He's like—he thought it was only me, you, no.*
>
> CHS:   *Yeah.*
>
> AD:    *I told him it was only me and you for-for awhile—for the first time.*
>
> CHS:   *Yeah.*
>
> AD:    *He's like, "Wallahi o billahi, I'm a throw the biggest halal party in the world." [laughter] He was like—he was like, "I would never let you all niggers out of my sight," {he said.}*

(Trial Exh. 253 (audio), 254 (transcript, p. 24-25)).[13]

Daud's contacts with ISIL fighters extended beyond friends he had in Minneapolis who made it to Syria, but also included ISIL fighters Abu Antar and Abu Khattab. The evidence demonstrated that both ISIL operatives known to Daud but unknown to Bashir. Yusuf also testified about this connection Daud had with Abu Antar. Specifically, Yusuf stated that in the fall of 2014, both Defendants Mohamed Farah and Daud were in contact

---

[13] Curry is another name for Abdi Nur.

with a known and current ISIL fighter named Abu Antar and that both defendants passed on information gleaned from this person.  Defendants Mohamed Farah and Daud relayed that Abu Antar was attempting to arrange for a person to make fake passports for them, and was also providing information on how to get from Turkey into Syria.  (Yusuf, 5/16/16, Tr. p. 26).  Yusuf noted in his testimony that the role played for the group by Abu Antar in the fall of 2014 was similar to that played by Mohallim earlier in the spring.  (*Id.*).

### F.  Defendant Daud's Participation in the Spring 2015 Plot to Join ISIL

His determination to join ISIL unabated, Defendant Daud again conspired with his co-defendants in the Spring of 2015 to join ISIL. This time, the plot involved crossing the U.S. border into Mexico, from there, the conspirators intended to fly to Turkey, cross into Syria and join ISIL.  (PSR ¶ 97).  Since Daud did not have travel documents, and the others had been unsuccessful in traveling with their real names, the group returned to their previous scheme to obtain false passports.  (*Id.*).  From there, Bashir told the group that he had a contact who could create fraudulent passports, although in reality, this contact was an undercover FBI agent.  (*Id.*).

Throughout the recordings, with the advent of this new opportunity to realize his *jihadist* dreams, Daud's enthusiasm and dedication to joining ISIL is striking.  Daud reacted with elation upon learning of the possibility of a fake passport connect, as Daud told Bashir after learning the news from other coconspirators: "*That's like the best news I heard ... like a heard in years, bro*" and "*I'm, I'm ready bro.  Wallah I got [UI] thousand in the account, all that.*"  (Trial Exh. 210 (audio), 211 (transcript, p. 51)).

This was no entrapment.[14] Throughout the recordings, Daud was anxious to reach Bashir and execute the plan.  Bashir even had to warn Daud, "*Don't be too hasty.*" (Trial Exh. 214 (audio), 215 (transcript, p. 40 – 42)). But Daud complained to Bashir that Bashir was unreachable, lamenting, "*We freaking call you bro, every day because there's no way to freaking reach you—.*" (*Id.*).   Daud tried to explain the aggravation of Bashir not responding to him because this new plan to leave for Syria was the "*freaking ... "the biggest news of my life."* (*Id.*).  For over a year Defendant had been plotting and waiting to become an ISIL fighter, and now that the possibility was real, he was singularly focused on executing the plan.

As was usual, Daud was no wallflower in the group; rather, Daud took charge of planning details such as researching flights, telling Bashir:

> AD:    *So we will, {I, right now,} I was looking at the, uh, uh, tickets from Tijuana.  We're going to go from straight Tijuana to Turkey?*
>
> CHS:  *You can do that if you want.*

(Trial Exh. 243 (audio), 244 (transcript, p. 29); *see also*, Trial Exh. 210 (audio), 211 (transcript p. 94-95)).

Where other coconspirators hesitated about the timing of the newest plot, Daud was thrilled and deemed Spring 2015 as the "perfect time."  (PSR ¶ 106).  Daud expressed the perfection of the timing in terms of his sacrifice and dedication for the cause:

> AD:    *This, this type of things, bro, it like, it like, wallahi.  Like bro, {me right now} my family that everything is going subhanallah bro.  Everybody in the world wants me to get married, and this, the perfect.*

---

[14] Defendant has since admitted he was not entrapped in his letter to probation.  (PSR ¶ 150).

> *'Cause this type of stuff that shows Allah, you know, "I'm not about this life." You gotta show him what you're sacrificing, and this is perfect, wallahi.*
>
> CHS: *Yeah.*

(Trial Exh. 222 (audio), 223 (transcript, p. 14-16); PSR ¶ 106).

As he contemplated finally making his way to Syria to be an ISIL fighter, Daud contemplated what role each might play in bringing violence to the United States. On March 23, 2015, Daud and co-defendants Mohamed and Adnan Farah discussed the possibility of ISIL wanting to send them back to the U.S. to commit acts of terrorism at home. After Adnan Farah, told them he is *"done with America,"* they discussed returning to the United States at the behest of an ISIL emir:

> AD: *[OV] Yo, you know this is the biggest one, the biggest doors in the world –brother-. Even when we get there {you know} we can use that guy if you want, you know? {If the emir sends us here.}*
>
> AD: *Willahi, Billahi, that's a door, {brother}.*
>
> AF: *I'm not coming back here.*
> AD: *No, we're not. I'm saying—*
>
> MF: *[UI] If he tells me to come back, {go have fun.} [UI].*
>
> AD: *No, what did he sa—no. [IA] know we eventually—this is the snake— uh—uh--the head of the snake. He's going to try and send us back. Do you guys know how to get anywhere in there? I got three brothers ready. Be like—yeah, we know. Be like just go around that place and look for it. Uh, we don't know the exact person, but be like just go. [noise]*
>
> MF: *Uh, this could be something huge.*
> UM: *[UI].*
>
> AD: *Huge, wallah.*

(Trial Exh. 214 (audio) and 215 (transcript pg. 64)).  The apparent willingness of Daud to conduct violence in the United States not only causes one grave concern about Daud's motives and character but also reveals his statements to probation about his motives for joining ISIL (e.g. "to defend Muslims") to be completely disingenuous.

Daud never hesitated in the Spring 2015 plan to leave for Syria and, by March 30, 2015, he provided Bashir with the photograph of himself and Mohamed Farah necessary for the fake passports.  (PSR ¶ 107).  To help finance the plot, Daud planned to sell his vehicle to raise the funds.[15]  When selling the car locally was a problem, Daud happily agreed to sell his car to the "passport connect" (the FBI undercover) for $5,000.  (PSR ¶ 125).  With Daud's source of financing in hand, on April 17, 2015, Daud, Bashir and Mohamed Farah, climbed into Daud's vehicle to drive to in San Diego and execute their plan to make their way to Syria.

Daud's determination to lead this group successfully into Syria continued on the eve of their departure.  Before leaving for California, Daud communicated with an ISIL fighter to obtain step-by-step information for how to successfully make it from Turkey to Syria, and saved this information onto his iPod that he took with him on the trip.  (PSR ¶ 126).  Daud can be heard on arecording relaying the information that he alone obtained from the ISIL fighter to Mohamed Farah and Bashir.  The Government presented a summary exhibit at trial demonstrating Daud's words on the recording repeating nearly verbatim the directions on his iPod that he received from the ISIL fighter:

---

[15] *See* March 19 conversation, Trial Exh. 210 (audio), 211 (transcript, p. 27) when Adnan Farah explains Daud "put his car up" for money.




## Defendant Daud Receives Directions from Abu Antar

### Exhibit 253 (Clip A) April 17, 2015    Exhibit 286 Defendant Daud's iPod

During the drive to San Diego, Daud, Mohamed Farah and Bashir continued watching and discussing propaganda videos including the Anwar al-Awlaki video, "Advice To Those Who Stay Behind from Jihad." (Trial Exh. 259). (PSR ¶ 127).

On the ride to California, Daud's excitement to become an ISIL fighter, and apparent hatred for America reached a fevered pitch. As they drove closer to the border, Daud declared: "*I can't believe I'm driving out of the land of kufar. I'm going to spit on the, uh, bor. I'm going to spit on America, wallahi, at the border crossing, curse those dogs.*" (Trial Exh. 256 (audio), 257 (transcript, p. 52.)).

25

His disgust for America was matched only by his desire to fight in the name of ISIL:

MF:    Once you breathe the air, God dang... When you hear the flags fluttering.

AD:    Like this? [noise], Allah! That's going to make me wanna, **like, bite someone's face off, wallahi.** What the hell that's just going [noise] like that. Right, Cali? It just goes [noise].

CHS:  Like the videos bro, at the end.

MF:    Yeah. [UI].

AD:    [Laughs]

(Trial Exh. 256 (audio), 257 (transcript, p. 36)).  And still later:

AD:    Wallah I don't know, I don't think I, I don't think I can sleep until I see the flags Wallahi I feel like I won't   sleep wallahi. I really feel like I will not sleep for the next five days Wallah. I'm a…man. [noise] Wallahi when I get picked up, I'm a tell the brother, **"Can I get an AK real quick? Can I borrow your AK five seconds?" I'm a shoot the lights out of that thing bro.** Wallahi I'm going to shoot it in the air.

CHS:  Yeah.

AD:    Yeah. **All the Shias, {I'm going to call,}** wallahi. All three of us are going to get shahadah before we even go to training camp.

AD:    Yeah! Cut the BS wallahi, straight up!

CHS:  Crazy.

AD:    Crazy? [Chuckles]  What do you mean you're crazy? I need some training man. Yeah. So I can put some work in.

(Trial Exh. 256 (audio) 257 (transcript pp. 67 - 68)).

By April 19, 2015, Daud and the others arrived in California to obtain their fake passports at a warehouse less than one mile from the Mexican border.  (PSR ¶ 128).  At the

warehouse, Daud continued taking the lead – he accepted the money for his vehicle, asked if their "passport connect" (the FBI undercover) could take them to the airport; and conversed with the undercover about him helping to conduct business at a future date with the others who could not make this trip.  (PSR ¶ 128).

Before Defendant could realize his dream of becoming an ISIL terrorist, law enforcement arrested him.  But for that intervention, Defendant would now be fighting for ISIL or have been killed doing so.

### III.    THE REPORT OF PRESENTENCE INVESTIGATION

#### A. Factual Statements and Sentencing Guidelines Calculations in the PSR

The United States has no objections to the factual assertions in the PSR.  The PSR calculates a base offense level of 33 for Count 1, Conspiracy to Murder Outside the United States.[16]  For Counts 2, and 6, Conspiring and Attempting to Provide Material Support to a Designated Foreign Terrorist Organization, the PSR calculates a base offense level of 26. The United States concurs that the terrorism adjustment of U.S.S.G. § 3A1.4 applies to each count of conviction, resulting in a 12 level increase in offense level and a criminal history of Category VI.   The PSR concluded that a two-level increase applied for

---

[16] By the time of trial, several of the defendants named in the Second Superseding Indictment had entered negotiated pleas of guilty.  In order to prevent jury confusion, a special form of indictment was prepared for the jury.  In the indictment prepared for the jury, counts which named only those defendants who had pled guilty were removed.  The counts of the indictment were then re-numbered, to avoid gaps in the numerical sequence of counts.  Finally, the Second Superseding Indictment was renamed, simply "Indictment" for the jury's sake.  The counts set forth in this Sentencing Position, and indeed, all references to a charging document, are to the Second Superseding Indictment, and not to the jury-only special form of indictment.

obstruction of justice based upon the Defendant's Grand Jury testimony.  The government agrees with the application of this upward adjustment under Section 3C1.1.

The PSR found an adjusted offense level of 45 for Count 1.  Because all adjusted offense levels greater than 43 are treated as a level of 43, U.S.S.G. Application Note 2 to Ch. 5, Part A (Sentencing Table), the defendant has an offense level of 43 and a criminal history category of VI, resulting in a guidelines sentence of life imprisonment.

### B.  Terrorism Adjustment Under U.S.S.G. § 3A1.4(a)

The defendant disputes the PSR's application of U.S.S.G § 3A1.4(a), the terrorism adjustment, which increases his Offense Level by 12 levels and places him in Criminal History Category VI.  Defendant contends that insufficient evidence exists to conclude that he had the specific intent to commit a federal crime of terrorism "calculated to influence or affect the conduct of government by intimidation or coercion."  (PSR, A.2).  The government concurs with the PSR's conclusion that the terrorism adjustment should apply to Defendant.  As will be discussed below, the evidence in the case established overwhelmingly that Defendant's offenses were felonies that involved, or were intended to promote, a federal crime of terrorism.

Section 3A1.4 is categorized under chapter three as a victim-related adjustment for terrorism.  Section 3A1.4 states, in pertinent part, that:

(a) If the offense is a felony that involved, or was intended to promote, a federal crime of terrorism, increase by 12 levels; but if the resulting offense level is less than level 32, increase to level 32.

(b) In each such case, the defendant's criminal history category from Chapter Four (Criminal History and Criminal Livelihood) shall be Category VI.

Application Note 1 to Section 3A1.4 states that the term "federal crime of terrorism" has the meaning given in 18 U.S.C. § 2332b(g)(5). Section 2332b(g)(5) states, in pertinent part:

> (5) the term "Federal crime of terrorism" means an offense that–
>
> > (A)    is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct; and
> >
> > (B)    is a violation of –
> > (i)    . . . 956(a)(1) (relating to conspiracy to murder, kidnap, or maim persons abroad), . . . 2339A (relating to providing material support to terrorists), 2339B (relating to providing material support to terrorist organizations) . . . .

This adjustment reflects an understanding by both Congress and the Sentencing Commission that "an act of terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal, and thus that terrorists and their supporters should be incapacitated for a longer period of time." *United States v. Meskini*, 319 F.3d 88, 92 (2d Cir.), *cert denied sub nom. Haouari v. United States*, 538 U.S. 1068 (2003). "We have recognized that 'Congress and the Sentencing Commission had a rational basis for creating a uniform criminal history category for all terrorists under [U.S.S.G.] § 3A1.4(b), because even terrorists with no prior criminal behavior are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation.'" *United States v. Stewart*, 590 F.3d 93, 143 (2nd Cir. 2009) (*quoting Meskini*, supra, 319 F.3d at 92).

In the case at bar, the evidence fully supports the conclusion that the crimes for which Defendant was convicted were felonies that involved, or were intended to promote,

a federal crime of terrorism. The disjunctive phrases in § 3A1.4 makes clear that the predicate offense must either (1) "involve" a federal crime of terrorism or (2) be "intended to promote" a federal crime of terrorism and that each clause has a separate meaning. As Daud's convictions are all enumerated under 18 U.S.C. 2332b(g)(5), the discussion will focus on the first prong, or theory, of the § 3A1.4 Adjustment.

### The "Involve" a Federal Crime of Terrorism Theory

For § 3A1.4 to apply under this prong, an offense must have been "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct," and the offense must be one of those enumerated in § 2332b(g)(5). The government submits that the Court must determine by a preponderance of the evidence that the defendant's offense was "calculated to influence or affect the conduct of government by intimidation or coercion or to retaliate against government conduct." *United States v. Jayyousi,* 657 F.3d 1085, 1115 (11th Cir. 2011); *United States v. Awan,* 607 F.3d 306, 317 (2d Cir. 2010); *United States v. Ashqar,* 582 F.3d 819, 824 (7th Cir. 2009) (preponderance of the evidence standard applies to consideration of the terrorism enhancement). The Court may draw reasonable inferences regarding the defendant's intent in committing the crime based upon the evidence. *See United States v. Mohammed,* 693 F.3d 192, 201-02 (D.C. Cir. 2012) (affirming the district court's application of the terrorism enhancement where the court "pointed to specific statements in the record – which Mohammed does not dispute he made – from which it [the district court] drew plausible inferences").

Counts 1, 2 and 6 for which Defendant stands convicted *are* enumerated in § 2332b(g)(5).  As summarized in this memorandum and the PSR, the body of evidence demonstrating that Counts 1, 2, and 6, were "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct" is significant.  The testimony of the government's expert Charles Lister, the ISIL propaganda videos, the social media content pouring forth from the co-conspirators and, of course, Daud's own recorded statements, e.g. that they could eventually be sent back to cause harm in America: "*know we eventually—this is the snake—uh—uh--the head of the snake. He's going to try and send us back. Do you guys know how to get anywhere in there? I got three brothers ready….*",[17] establish by more than a preponderance of the evidence that the application of this adjustment to Counts 1, 2, and 6 under the first prong is proper.

Defendant Daud suggests that he lacked the specific intent to commit a federal crime of terrorism "calculated to influence or affect the conduct of government by intimidation or coercion."  (PSR A.2).  Even if specific intent was required for the adjustment to apply, the evidence in the record as to Defendant Daud's words and conduct in this case would sustain that burden.   However, specific intent is *not* required for Section 3A1.4's

---

[17] Several members of the conspiracy, including Defendant, have attempted to justify their crimes by claiming they sought to join ISIL in order to fight and topple the regime of Bashir al Assad in Syria.  This attempt to divorce themselves from both the murderous practices of ISIL and the terrorist organization's global aspirations is understandable but fraudulent.  However, even if the Court were to accept as true Defendant's description of his motivations for joining ISIL: to defend Muslims, establish a Caliphate, only kill al-Assad's soldiers (PSR ¶¶ 150, 151), the application of § 3A1.4 would remain proper.  Indeed, the attempt to topple a government through violence necessarily "influences or affects the conduct of government."

application.  *See United States v. Awan,* 607 F.3d 306, 317 (2d Cir. 2010) (defendant's personal motive for committing an offense that involves a federal crime of terrorism is not relevant).

Further, the guidelines – including both prongs of § 3A1.4 – are to be determined on the basis of all acts committed by the defendant, and all acts of others that were within the scope of the jointly undertaken criminal activity, in furtherance of the criminal activity, and reasonably foreseeable in connection with that criminal activity.  U.S.S.G. Section 1B1.3(a) and (b).  This section imputes to Defendant Daud, by way of example, the evidence that ISIL has repeatedly called for violent attacks against Western countries, to include the United States.   For all the foregoing reasons, Defendant Daud's objection to the application of the § 3A1.4 Adjustment should be overruled.

## IV.    ARGUMENT

In *Gall v. United States,* 552 U.S. 38 (2007), the Supreme Court set forth the appropriate sentencing methodology: the district court calculates the advisory Guidelines range and, after hearing from the parties, considers the 18 U.S.C. § 3553(a) factors to determine an appropriate sentence.  552 U.S. at 49-50; *United States v. Ruvalcava-Perez,* 561 F.3d 883, 886 (8th Cir. 2009) ("In sentencing a defendant, the district court should first determine the appropriate Guidelines range, then evaluate whether a traditional departure is warranted, and finally decide whether or not to impose a guideline sentence after considering all the § 3553(a) sentencing factors.")

The district court may not assume that the Guidelines range is reasonable, but instead "must make an individualized assessment based on the facts presented."  *Id.* at 50.

If the court determines that a sentence outside the Guidelines range is called for, it "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Id.* Section 3553(a) requires the Court to analyze a number of factors, including, "the nature and circumstances of the offense," "the history and characteristics of the defendant," "the need for the sentence to reflect the seriousness of the offense," "the need for deterrence," "the need to protect the public from further crimes of the defendant," and "the need to avoid unwarranted disparities."  18 U.S.C. § 3553(a).

Defendant Daud should be sentenced to a term of imprisonment of 30 years.  This is a variance downwards from the advisory Sentencing Guidelines sentence of imprisonment for life.  This sentence satisfies 18 U.S.C. § 3553(a) standard of being sufficient, but not longer than necessary, to effectuate the objectives of federal sentencing law and policy.  The modest downward variance, from life to thirty years, is necessary to appropriately differentiate among differently culpable defendants in this particular case.

### A. Nature and Circumstances of the Offense

The nature and circumstances of the offenses are set forth in detail in Common Appendix A, as well as in the detailed recitation above.  Defendant stands convicted of multiple crimes related to international terrorism.  The terrorist organization he sought to assist is one of the most dangerous and violent in existence.  ISIL has, within the past two years, carried out mass casualty terrorist attacks in Beirut, Paris, Brussels, Nice, and San Bernardino, while a man claiming to be acting on ISIL's behalf has carried out a mass shooting, killing 50 persons, at a nightclub in Orlando.  This of course does not even

include the murder and mayhem ISIL commits in Syria. Even just amongst this small group of coconspirators, several of the men are presumed dead. The loss of life at the hands of ISIL is incalculable.

The threat to the national security of the United States for these crimes is grave. The seriousness of the nature and circumstances of a terrorism case wherein the terrorist organization is ISIL, is a reason for a lengthy term of imprisonment in this case.

### B. History and Characteristics of the Defendant

Defendant holds deeply radical jihadist beliefs. For over the span of a year of this conspiracy, Defendant at every turn sought to become a terrorist for ISIL, and when failing that, assisted his coconspirators in their terroristic efforts.

Defendant is a man who graduated from high school, managed to have steady employment, and has the strong support of his family. (PSR ¶¶ 150, 212, 216). Despite all that, Defendant chose a path to become a terrorist. Although Defendant does not have any real prior criminal history, Defendant's convictions here do not represent a single, impulsive act. Rather, Defendant's criminality in this case involved multiple steps, over nearly a year, to try and travel to Syria where he would join ISIL.

Even just focusing on recent events, it is clear that Daud deeply believes in waging *jihad*. Daud's enchantment with Anwar al-Alawki alone could demonstrates this. But Daud did more than just listen to radical jihadists. He did more than just harbor his extremist beliefs. Daud also matched his teachings from al-Alawki with actions. Daud's commitment for himself, and for his coconspirators, to join ISIL, is evident in a myriad of ways, with conduct ranging from as simple as encouraging his coconspirators to shop for

34

supplies for their travels, to actually purchasing a fake passport to get out of the country, and to aspire to conduct violence in the United States. This list of Defendant's criminal conduct spans an entire year and could go on and on: Daud gave money to Adnan Farah for his passport; introduced Yusuf to Anwar al-Awlaki; he orchestrated the date of November travel; he arranged to sell his car to finance the Spring 2015 travel attempt; he communicated in detail with ISIL fighters; he espoused his radical beliefs to inspire and encourage others. As the detailed facts above lay out: at every turn, during every plot and plan, Defendant was there – scheming, waiting, and wanting to wage jihad, not just for himself, but also for his friends, whom he pushed and encouraged throughout.

Tellingly, Defendant did not just casually select ISIL as his chosen terrorist group. Rather, he and the coconspirators took time to debate, learn, and consciously select ISIL. This despite, and maybe because of, ISIL's ruthlessness. In this context of not just terrorism, but terrorism for ISIL, only an extremely significant sentence could reflect the nature of his character that he chose and sought to become an ISIL fighter.

Defendant was undeterred in his radical objective at every turn. Defendant sat, under oath, before the Grand Jury, being questioned exactly on his groups' plots to join ISIL and still he was not scared away from wanting to become a terrorist. Rather, Defendant lied to the Grand Jury and later he even later mocked the process when talking amongst his coconspirators, (Trial Exh. 193 (audio), 194 (transcript p. 9)).[18] Undeterred

---

[18] In this conversation, Daud is mimicking the questioning by the prosecutor: *"They said, "Um, do you have Kik?" I said, "Um, yes I do." They said, "Do you use your own name?" I said, "No." And then I was like, "Why are you asking me about that?" And then he said, "Don't worry about it," {he said.} And then he asked me Wickr. So I had Wickr."*

after his grand jury testimony, Defendant simply set about finding his next scheme to leave the country to fight for ISIL.

But perhaps worse than Daud's lies under oath before the grand jury, were his lies and double-talk to probation. Defendant submitted a letter and spoke with a probation officer following his conviction by the jury. (*See* PSR, ¶ ¶ 150; 198-207). In Defendant's statements he attempted to portray himself as a man concerned only with defending "fellow Muslims," that he was incapable of violence, that it was "difficult" for him to "criticize [coconspirator's] plans," and he was "manipulated" by them. (*See e.g.,* PSR ¶¶ 150, 203). Defendant attempted to explain away all the evidence to the contrary by claiming in choosing ISIL he managed to "blur[] out" "thoughts of violence" and blamed the "environment" on his codefendants that "allowed him to say terrible things." (PSR ¶ ¶ 199, 203).

All the evidence, including the recordings, of course expose the absurdity of Defendant's claims to probation. For example, Daud made a ridiculous claim that he did fully believe he "would actually be fighting in Syria" and that what attracted him to talking to Nur was his "message" which focused on Nur having a home and a wife in Syria. (PSR ¶ ¶ 150, 200). Naturally, the recorded conversations are replete with references about fighting, death and injury. For example, in one conversation, Bashir, and Defendant were explaining to Mohamed Farah how Nur told them about fighting in Khobani. Bashir first explained, *"They were in Khobani, they were fighting, they got pinned down in a house and then an air strike hit them."* To which Daud chimed in with agreement: *"Yeah, they*

*got pinned down in the house."* (Trial Exh. 214 (audio), 215 (transcript p.183)).  Daud then

explained how Nur related to him how several ISIL fighters got "shahada":[19]

> AD:    *He said, when that—th-that—when that happened, he said he went back.  He said, Rasas like three got it, right? Three people got it first. And after three people, then we I-I w—I w—then, uh, we went back. And then when we came back, {he said} we was in the house.  {He said} three, and then three more got—In the same house I was in {he said.} They got shahada…*

(Trial Exh. 214 (audio), 215 (transcript pgs. 184)).  The recordings are also telling on what

they do not say: in the nearly one hundred hours of statements by Defendant and his

codefendants that were recorded and introduced at trial, do any of the codefendants speak

about helping the Syrian people, or alleviating their suffering.  Indeed, this recent claim by

Daud that he wished to travel to Syria to join ISIL to help alleviate the suffering of Muslims

in Syria may well be Daud's biggest lie to date.

Defendant's ability to so blithely portray himself to probation as a person

completely contrary to the evidence, demonstrates a lack of acceptance of responsibility of

his actions and speaks to his deep radicalization.

Defendant's persistence to attempt to join ISIL and to hide his radical beliefs is both

astonishing and troubling and makes him a dangerous individual in need of a significant

sentence.

---

[19] Bashir explained "shahada" to mean to "die a martyr."  (Bashir, 5/23/16, Tr. p. 48).

### C. Need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense.

Defendant Daud stands before the court convicted of some of the most serious crimes in the federal criminal code. In fact, the Supreme Court has recognized combating terrorism as "an urgent objective of the highest order." *Holder v. Humanitarian Law Project,* 561 U.S. 1, 130 S. Ct. 2705, 2724 (2010). Three people, at least, have died in Syria as a result of this conspiracy – Douglas McAuthur McCain, Abdi Nur, and Yusuf Jama. The offense's seriousness is adequately reflected in a thirty-year sentence, as is respect for the law and just punishment.

Defendant and his group of coconspirators had no respect for the law. Throughout the conspiracy, defendants knew fully that what they were doing was illegal and that law enforcement would be trying to stop them. Instead of respecting the laws and those efforts, Defendant and his friends took great pains to conceal their communications and their true identities. Defendants selected diverse meeting places and intentionally selected methods of communications such as Kik or Surespot, that they believed would obstruct the government's efforts to ferret them out. Defendant, after all, was the great promotor of "fake it until you make it." When Defendant and his coconspirators were confronted more directly – for example testifying before the Grand Jury or interviews by the FBI– they lied and obstructed the investigation. This utter disrespect for the law and all its processes by the defendants merits a lengthy sentence.

Respect for the law is a particularly important factor in this case beyond just the defendants themselves. No trial in the aggregate memory of the U.S. Attorney's Office

has been conducted in more of an atmosphere of intimidation and harassment than the trial of this case. The families of cooperating defendants were harassed in the courtroom, in full view of the testifying witness; there was a fistfight in the corridor outside the courtroom; multiple individuals had to be ejected from the courtroom for not following the Court's reasonable, non-onerous rules of behavior. A serious sentence is needed to promote respect for the law, not just for defendants, but for those who purport to support them.

The extreme nature of his crime, and Defendant's dedication to that objective, calls for a 30-year sentence to provide just punishment for the offense.

### D. Need for the sentence imposed to afford adequate deterrence to criminal conduct, and the Need for the Sentence Imposed to Protect the Public from Future Crimes of This Defendant.

A significant sentence in this case is needed for individual and general deterrence and to protect the public from this Defendant. Individual deterrence discourages a defendant from ever committing such a crime again. General deterrence is necessary to deter other people from committing similar crimes. "Congress specifically made general deterrence an appropriate consideration . . ., and we have described it as 'one of the key purposes of sentencing.'" *Ferguson v. United States,* 623 F.3d 627, 632 (8th Cir. 2010) (*quoting United States v. Medearis,* 451 F.3d 918, 920 (8th Cir. 2006)).

Not too long ago, Minnesota suffered a wave of young men traveling to join al Shabaab, and presumably many of those young men are now dead. Despite these deaths and the surrounding investigation and prosecutions, here yet another group of Minnesota men attempted to leave the United States to become terrorists. As the Court witnessed in

the Courtroom and surrounding press coverage, despite the gravity of the charges, the defendants had significant community support. General deterrence is necessary to impress upon the greater community that no matter the circumstances, trying to become a terrorist for ISIL has dire consequences.

A substantial sentence is necessary to deter individuals, like the defendant, from supporting international terrorism. As the Supreme Court has recognized:

> 'Material support' is a valuable resource by definition. Such support frees up other resources within the organization that may be put to violent ends. It also importantly helps lend legitimacy to foreign terrorist groups – legitimacy that makes it easier for those groups to persist, to recruit members, and to raise funds – all of which facilitate more terrorist attacks.

*Holder v. Humanitarian Law Project* at 2725.

The case for individual deterrence, and the case for a sentence that protects the public from further crimes of Defendant, is extensively laid out above in this position pleading and Appendix. The details of this Defendant's extensive, persistent, and long-lasting role in this crime speaks for itself as an explanation of Defendant's threat to public safety and national security. The thirty-year sentence sought by the government is justified to protect the public from Defendant's deeply held desire to become an ISIL fighter.

Terrorist activity by ISIL has only increased since Defendant first began plotting to leave for Syria. Given the compelling need to deter the continued threat of terrorism, a substantial term of imprisonment would send a clear message to any future terrorists, and those who would support them, that such conduct will not tolerated by the U.S. government.

Terrorism, being motivated by fanaticism, is difficult to deter. The effort must nevertheless be made. However, if deterrence should be unavailing, then a thirty-year sentence is amply justified as a means of incapacitating the defendant.

### E. The Kinds of Sentences Available, the Need to Avoid Disparities, the Need to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner

At this time, it is difficult to identify any particular programming that will benefit Defendant. No such programming is identified by the PSR. As noted by the Court during the hearing held to present the assessments of the court's expert, Daniel Koehler, there is at this time no counter-radicalization programming offered by the Bureau of Prisons. In any event, there is no indication that Defendant would participate in, or benefit from, such counter-radicalization programming. This particular 3553(a) factor appears to be inapplicable to this Defendant, though should that change during his term of imprisonment, the government will of course not stand in the way of Defendant receiving any programming that will reduce the risk he currently represents to the safety of the public.

Defendant Daud did not plead guilty, and he has been convicted not only of 2339B counts, but also of conspiracy to murder. The sentence of thirty years' imprisonment, requested by the government, is consistent with the national sentencing pattern in similar cases and with the recommendations made by the government on co-defendant Mohamed Farah, whom the government believes is equally culpable to defendant Daud.

## V.   CONCLUSION

For all these reasons, the United States respectfully asks this Court to sentence Defendant Daud to a term of imprisonment of thirty years, followed by supervised release for the rest of his life.

Dated:  November 3, 2016          Respectfully submitted,

                                  ANDREW M. LUGER
                                  United States Attorney

                                  *s/ Julie E. Allyn*

                                  BY: JULIE E. ALLYN
                                  Assistant United States Attorney
                                  Attorney ID No. 256511

                                  JOHN DOCHERTY
                                  Assistant United States Attorney
                                  Attorney ID No. 017516X

                                  ANDREW R. WINTER
                                  Assistant United States Attorney
                                  Attorney ID No. 232531

## COMMON APPENDIX A – THE SYRIAN INSURRECTION AND ISIL

This Appendix A to the Government's Sentencing Positions describes (a) historical and Syrian current affairs context that is common to all nine Sentencing Positions being submitted to the Court by the government, and (b) a capsule summary of the facts proven at trial. This Appendix is reproduced in each of the government's sentencing positions, and is identical in each. No attempt has been made to write a factual summary that is more comprehensive than the very thorough Reports of Pre-Sentence Investigation written in this case by United States Probation officers. However, this Common Appendix A does go into more detail than the PSRs about the history of the Syrian insurrection, and the role in that insurrection of the designated foreign terrorist organization the Islamic State in Iraq and the Levant, or "ISIL." If there is interplay between events in Syria and events in Minnesota, Common Appendix A tries to correlate events in Syria with significant events that were happening in this case, here in Minnesota, at about the same time as the events in Syria.

As to the first part of Common Appendix A, history and current events, Common Appendix A relies upon the trial testimony of the government's expert witness, Charles R. Lister, Senior Fellow at the Middle East Institute, Washington, D.C. Common Appendix A does not summarize all of Mr. Lister's testimony. Instead, it highlights those parts of his testimony which are important to understanding the issues in these sentencings. These matters are a short history of the Syrian insurrection, the origins of ISIL, as well as ISIL's extraordinary brutality and the part such brutality plays in ISIL's recruitment of foreign fighters. Finally, this Common Appendix A concludes with a brief description of ISIL's

understanding of the importance, to what in ISIL's view would be an observant Muslim, of participating in the fighting now taking place in Syria.

The second part of Common Appendix A seeks to provide an overview of the facts of the case, and to provide a description of the facts of the case that can be referred to in all of the government's sentencing position papers.

The facts concerning historical background and Syrian current events in Common Appendix A are taken from a transcript of the trial testimony of the government's expert witness, Charles R. Lister, Senior Fellow at the Middle East Institute, Washington, D.C. As to other trial facts, which have not yet been transcribed, Common Appendix A relies on the contemporaneous notes of Assistant U.S. Attorneys and FBI Special Agents.

**Developments in Syria from the Arab Spring (2011) to 2013 Abu Musab al-Zarqawi's founding of ISIL (2013)**

Syrian President Bashar al-Assad took power in 2000, continuing the reign of his father, Hafez al-Assad. Between them, the two Presidents al-Assad have ruled Syria as a dictatorship for more than forty years. Bashar al-Assad has used brutal repression against his political opponents, including extensive and intrusive police surveillance followed by arrest, torture, and execution. The efforts of ordinary citizens, during the "Arab Spring," to protest against the regime, were met by the Assad regime with violence.

The Arab Spring began at the end of 2011, and was triggered by a Tunisian man who burned himself to death in a desperate act of protest after being humiliated by the police. The Arab Spring anti-dictatorship movement spread across North Africa and the Middle East in the months that followed.

In Syria, the wealthy had for decades been supporters of the regime. After Bashar al-Assad took power in 2000, this increased, and the gap between rich and poor in Syria became even more stark than it had been. When Bashar al-Assad introduced economic liberalization measures, with support given to small businesses, it turned out that the small businesses that received assistance were the small businesses of regime supporters.

On March 6, 2011, the Syrian internal security services arrested 15 schoolboys in the southern Syrian city of Deraa, alleging that they had been chanting revolutionary songs as they walked home from school. All the boys were tortured, and several of them were killed. Peaceful protests of the boys' arrest were met by the regime with live ammunition, resulting in several deaths. Over the next few days, protests spread to numerous Syrian cities. The arrest and torture of these schoolboys in Deraa, and the regime's heavy-handed response to it, marks the beginning of the Syrian insurrection against President Bashar al-Assad. The insurrection soon transitioned from peaceful protest to armed revolt against the Assad regime.

The reaction of the Bashar al-Assad regime to the events in Deraa was consistent with the reaction to opposition of President Bashar al-Assad's father, Hafez al-Assad, during the time he had been Syria's president. For example, in the 1980s a splinter faction of the Muslim Brotherhood tried to rise up in arms against President Hafez al-Assad in the Syrian city of Hamaa. President Hafez al-Assad responded with months of artillery shelling of Hamaa, which killed between 10,000 and 40,000 of the city's inhabitants.

As protests and fighting spread across Syria during 2011, the United States expressed sympathy for Syrians engaged in peaceful, anti-Assad protests. U.S.

Ambassador to Syria Robert Ford attended several anti-regime protests, a clear signal of U.S. government support. The regime responded by physically threatening the U.S. Embassy, and at one point withdrew security personnel from around the embassy and allowed pro-regime thugs to ransack the building. The United States then withdrew its diplomats from Syria. The United States has had no diplomatic or consular representation in Syria since 2011.

Arab Spring opposition to the Assad regime spanned all sectors of Syrian society. One component of the anti-regime opposition was a specifically religious, Islamic opposition. For a time following the U.S. invasion of Iraq, President Bashar al-Assad was able to neutralize the Islamic opposition within Syria by busing Islamic fighters over the border into Iraq, where they could fight Americans and their Iraqi allies. Eventually some of these Islamic fighters returned from Iraq (or Lebanon, another place to which the Assad regime had sent them) to Syria.

## I. THE SYRIAN HISTORICAL AND CURRENT EVENTS CONTEXT OF THIS CASE.

### A. Abu Musab al-Zarqawi, the Origins of ISIL, and the Roots of ISIL's Extreme Violence

In 1999, Abu Musab al-Zarqawi was released from the Jordanian prison where he had been serving a sentence for support of a terrorist organization. Shortly after his release from prison, Zarqawi traveled to Afghanistan, where he made contact with the senior leadership of al-Qaeda. With $200,000 of al-Qaeda's money, and a plot of land donated by the Taliban, Zarqawi established a terrorist training camp in Afghanistan. In 2000, Zarqawi and the organization he had founded attempted to perpetrate the "millennium

plot," which included attacks on the Radisson Hotel in Amman, and several other western hotels in Amman. The plot was foiled.

When the U.S. invaded Afghanistan following the attacks of September 11, 2001, Zarqawi fought for a short while, but then fled Afghanistan, going first to Iran, and then on to northern Iraq. Following the U.S. invasion of Iraq, Zarqawi and his organization conducted a campaign of bombings against the United States military and other targets, including the United Nations and the Jordanian embassy. At this time, Zarqawi did not have any official relations with al-Qaeda, but in late 2003 and on into 2004 Zarqawi reached out to al-Qaeda in an effort to have his organization and al-Qaeda work together. In May of 2004, Zarqawi conducted his first videotaped beheading, of U.S. hostage Nicholas Berg. Several months after this atrocity, in October of 2004, Zarqawi "made *baya*" (swore allegiance) to al-Qaeda. Zarqawi's organization took the name "al-Qaeda in Iraq," and became al-Qaeda's first international affiliate.

Zarqawi was ferociously anti-Shiah, and his organization in turn became deeply anti-Shiah. Zarqawi believed the Shiah had to be fought until they were all exterminated. Zarqawi dispatched his own father to carry out a suicide bombing at a Shiah shrine in the Shiah holy city of Qatib, in southern Iraq, which killed a Shiah ayatollah. Shiah were referred to by the insulting term "rafidi" which means "one who refuses," specifically, one who refuses to recognize the legitimacy of the line of succession from the prophet that is recognized by Sunni Islam. The Assad regime, although its top members are Alawites, gets support from Iran, the dominant Shiah power in the middle east, and opposition or

support for the Assad regime tends to fall along Shiah-Sunni lines, with Shiah in support of the regime, and Sunni in opposition to it.

Following the pledge of *baya*, tension between Zarqawi and al-Qaeda persisted, primarily over the issue of brutality and the killing of Muslims. Zarqawi's bombing campaign in Iraq may have targeted non-Muslims, but the bombs were very powerful, were often detonated in public places, and as a result they killed many Muslims. In Zarqawi's view, such deaths were acceptable, because Zarqawi believed Iraqi society needed to be thoroughly cleansed of all western and secular influences. To al-Qaeda, however, Zarqawi's bombings were a catastrophe in terms of al-Qaeda's ability to maintain the support of ordinary Muslims. There was an exchange of letters between al-Qaeda and Zarqawi over this issue, at the end of which al-Qaeda ordered Zarqaqi to be more discriminating in his bombing. In response, Zarqawi's behavior, if anything, actually got worse.

Zarqawi was killed by American military action in June of 2006. In October of 2006 one of his successors as the leader of al-Qaeda in Iraq renamed the organization "the Islamic State in Iraq." After some years in which it was not clear whether the Islamic State in Iraq was or was not still part of al Qaeda, the two organizations formally split in 2013.

Before the split, in May through August of 2011, discussion began about opening a Syrian wing of the Islamic State in Iraq. In August of 2011, seven senior members of the organization crossed into Syria, and activated a dormant network of safehouses in northeastern Syria. In Syria, this group went by the name Jabhat al-Nusra, the "support group." When the split between the Islamic State and al-Qaeda occurred in 2013, Jabhat

al-Nusra remained a part of al-Qaeda, while the Islamic State went on its own, independent path.

In June of 2014, abu Bakr al-Baghdadi, then leader of what had become the Islamic State in Iraq and the Levant, or "ISIL," mounted the steps of the pulpit in a mosque in Mosul, Iraq and proclaimed the re-establishment of a caliphate, a supreme Islamic religious and political entity that had a legitimate claim to the loyalty of every Muslim in the world.

### B. ISIL's Need for, and Recruitment of, Foreign Fighters

Several factors drove ISIL to need foreign fighters to fill its ranks.

First, as testified to by Mr. Lister, ISIL did not govern populations so much as it controlled them.  Its theological rulings were bizzare (the sale of ice cream was forbidden because ice cream did not exist in the prophet's time, and the sale of cucumbers was forbidden because cucumbers were sexually suggestive, for example), and its punishments for even minor infractions were extraordinarily sadistic and carried out in public. ISIL could recruit from the local population only through fear, and as a result local recruits understandably tended not to be good fighters.  Second, from August of 2013 until July of 2014, ISIL did not fight the Assad regime; instead, it waged war on other anti-regime opposition groups.  Of the 7,000 people killed in combat by ISIL during the first six months of 2014, not one was an Assad regime soldier.  At this same time, the Assad regime stopped fighting ISIL, probably because the regime recognized that ISIL was doing the regime's work for it.  These facts made it impossible for ISIL to augment its numbers by allying with other opposition groups.

In response, ISIL recruited very heavily from abroad, relying on three different recruiting messages.

First, abu Bakr al-Baghdadi, in his role as caliph and leader of the faithful, claimed that it was the duty of all Muslims throughout the world to come and join the Islamic State, and to fight for that state. Second, ISIL used its extreme brutality as a recruiting tool. To do so, ISIL characterized its actions to a local audience as expressions of power and dominance over a Shiah-dominated Iraqi government, and to an international audience as an organization that was bringing power back to Sunni Islam by showing no mercy to the enemies of Sunni Islam. To publicize its brutal acts, ISIL has proven very savvy at using electronic media. As the evidence at trial showed, many ISIL propaganda videos were enthusiastically viewed by defendants in this case.

Third and finally, ISIL has adopted an apocalyptic ideology about the end times which places great value on dying as a martyr in Syria at this particular time in human history. At the end of human history, ISIL preaches, Jesus will descend from heaven to the white minaret of the main mosque in Damascus, and from there will lead an army to the Syrian village of Dabiq, northeast of Aleppo, where the final battle between the forces of good and the forces of evil will be fought. As Mr. Lister explained:

> . . . one of the reasons why ISIL has been so effective at recruiting so heavily from non-Syrian and Iraqi populations is because it has claimed to be operating in Syria within this broader mindset. The idea that you can go and fight in Syria in order to contribute towards bringing about the end of the world is something that its ideology – its propaganda, sorry, has made very clear for a long time. In fact, Dabiq was something that Abu Musab al-Zarqawi all the way back in the 2000s spoke about very clearly, our armies will one day reach Dabiq, and, you know, bring about the end of days. So

it's a core tenet, it's a core principle of ISIL's belief. And fundamentally, it's a core reason for why they wanted to operate in Syria all along.

When asked to link this ideology to the recruitment of a potential foreign fighter, Mr. Lister continued:

> I mean, generally speaking, there is a belief within these organizations that if you fight in the name of Allah, in the name of God, and you die as a martyr, you will automatically go to paradise. I believe their understanding is that if you die in these battles, which ISIL claims to be bringing out the end of days, then you will obtain a, you know, a high place in paradise alongside God. So the importance of fighting in Syria specifically, as I say, is of that utmost importance.

Finally, Mr. Lister pointed out in his testimony that some of the outrages perpetrated by ISIL, such as the beheadings of western hostages, were "trying to bait the west into intervening more," in order to precipitate the final battle between Muslims and non-believers.

As a result of all three factors, a vast majority of ISIL's forces at for example, the battle of Kobani, under the command of ISIL commander Omar al-Shishani, were foreigners, who sustained huge casualties. Of note, the battle of Kobani pitted ISIL against Kurdish militia. At no time, did the battle of Kobani involve combat between ISIL and Assad regime forces.

## II.    THE FACTS OF THIS CASE

The evidence at trial demonstrated the existence of a conspiracy among the defendants to travel to Syria via Turkey, cross the border into Syria, and there join, and fight for, ISIL. There were three major efforts by the defendants to reach Syria, in the Spring of 2014, the Fall of 2014, and the Spring of 2015.

The Spring of 2014 effort had two components.  In one, defendant Guled Omar, together with Abdirahman Bashir (then a member of the conspiracy, later a cooperating human source for the FBI) and Yusuf Jama, attempted to drive to Mexico and travel onwards from Mexico to Turkey and then Syria.  In preparation for this attempt, defendant Omar withdrew $5,000 in cash using his federal student financial aid debit card.  Those funds were never repaid, and as a result of this financial behavior, defendant Omar was later found guilty of federal financial aid fraud, in violation of 20 U.S.C. § 1097.  The attempt at driving was thwarted by defendant Omar's family.  Later, however, on June 9, 2014, Yusuf Jama left the Twin Cities by Greyhound bus, traveled to New York City's John F. Kennedy International Airport (hereinafter "JFK"), and flew from there to Turkey and onwards to Syria.  Jama is believed to have later been killed in combat while fighting for ISIL and against Kurdish militia at the battle of Kobani.

The second component of the conspirators' Spring of 2014 effort involved cooperating defendant Abdullahi Yusuf's attempt to travel on May 28, 2014, and Abdi Nur's successful travel on May 29, 2014.  Yusuf was booked on an itinerary that would have taken him on the Russian airline Aeroflot from Minneapolis-Saint Paul to JFK, then on to Moscow, Russia, before taking an Aeroflot flight from Moscow to Istanbul. However, when Yusuf applied for a passport on April 28, 2014, he aroused the suspicions of an alert passport specialist in the Minneapolis passport office.  The passport specialist relayed his suspicions to his supervisor, who told the FBI.  As a result, FBI Agents were waiting for Yusuf when he arrived at the Minneapolis – Saint Paul airport on May 28 to

catch his flight to JFK. Yusuf was denied boarding, and after continuing to falsely claim to the FBI that he was going solo to Istanbul for vacation, sent home.

The Fall of 2014 effort also had two components. In the first, defendant Guled Ali Omar again tried to reach Mexico, this time by taking a flight from Minneapolis – Saint Paul to San Diego. The FBI was told that defendant Omar had made a travel booking, and federal agents met Omar at the airport. Omar arrived at the airport carrying no luggage, and in possession of his passport. He was denied boarding and sent home. After being turned away at the airport, defendant Omar telephoned defendant Hanad Musse, using "Magic Jack," an application that disguises one's telephone number. In that call, defendant Omar pleaded with defendant Musse to drop their own plans to travel to Syria. In that telephone call, defendant Omar told defendant Musse that "I just got caught up."

The plans from which defendant Omar was trying to dissuade defendant Musse involved Musse and three other defendants – Mohamed Farah, Hamza Ahmed, and Zachariah Abdurahman – following the example of Yusuf Jama by taking Greyhound buses to JFK, and flying from there to various destinations in southeastern Europe, such as Athens, Istanbul, and Sofia, and then traveling on to Turkey and, ultimately, Syria.

Musse refused to drop the plans and "the JFK Four" continued to New York. There, they were met by agents of the FBI and denied boarding. Defendant Hamza Ahmed had boarded his flight, and was escorted off the aircraft by federal agents. When three of the four were interviewed by the FBI in New York (defendant Hanad Musse left JFK without being interviewed; however, Mohamed Farah, Hamza Ahmed, and Zachariah Abdurahman were interviewed at JFK), they lied, claiming that they did not know each other, and that

11

they were all traveling to Europe, by themselves, for vacation. In the case of defendant Mohamed Farah, this meant that he claimed to be traveling to Sofia, Bulgaria, in November, for a beach vacation lasting one day. Upon return to Minnesota, each of the defendants was given a target letter from the U.S. Attorney's office, telling them they were targets of a federal criminal investigation into allegations of conspiracy to provide material support to a designated foreign terrorist organization. The JFK Four were then again interviewed, this time by Minneapolis-based FBI agents. They maintained the fictions they had given to the New York FBI agents. (Defendant Hanad Musse had not been interviewed in New York.)

Later in November of 2014, defendant Abdullahi Yusuf, who had been at liberty since trying to leave in late May, was arrested on a criminal complaint charging him., together with Abdi Nur, with conspiring to provide material support and resources to ISIL, and with actually providing material support and resources to ISIL (the material support and resources provided was the person of Abdi Nur). In February of 2015, defendant Hamza Ahmed was arrested, and detained pending trial. Defendant Ahmed was therefore unable to conspire with his codefendants when, in the Spring of 2015, they began conspiring yet again to go to Syria to join ISIL.

The failure of the Fall 2014 attempt did not lead the defendants to drop their ambitions to travel to Syria. In the Spring of 2015, they again began planning to leave the United States, go to Turkey, then go onwards into Syria to join, and fight for, ISIL. Shortly after this third and final round of plotting began, Abdirahman Bashir decided to cooperate

with the FBI's investigation. He wore a recording device and recorded many hours of incriminating conversations between March and April of 2015.

The defendants had hoped to make a connection in Tijuana, Mexico, with a source for false passports. When this plan could not be completed, because Abdi Nur, in Syria, was unable to connect with the Mexican ISIL fighters who were to provide the contact information in Tijuana, Bashir, with the approval of the FBI, stated that he had a source for false passports in San Diego.

On April 17, 2015, Bashir, together with defendants Mohamed Farah and Abdirahman Daud, left home in defendant Daud's Honda Civic, bound for San Diego. Upon arrival in San Diego on Sunday, April 19, defendants Daud and Farah were arrested at a warehouse in San Diego when they took possession of fake passports from "Miguel," a San Diego police officer who had been acting the part of a procurer of fake passports. The arrests in San Diego were followed within minutes by the arrests in Minnesota of the remaining defendants: Guled Ali Omar, Adnan Abdihamid Farah, Zachariah Yusuf Abdirahman, and Hanad Mustofe Musse.